Coughing Coughing Ready for him to start. You may proceed. Thank you. Thank you, your honor. May it please the court. My name is Jevin Sloan, I represent the appellant John D. Carruth, who is here in the courtroom with me today. State governments are entrusted with heavy and often dangerous powers, but these powers are not unlimited, and that is why we are here today. Mr. Carruth's 32-year career at Alabama One Credit Union came to an abrupt halt on August 25th, on August 27th, 2015, when the state of Alabama conserved the credit union and terminated him as the CEO. The detailed allegations of our complaint painted a disturbing picture of conduct that took place behind closed doors at the office of the governor of the state of Alabama during the few years preceding Mr. Carruth's termination. The district court held that these allegations were not enough to defeat a qualified immunity defense at the motion-to-dismiss stage. I would like to focus on three key errors that we believe the district court made and that the appellees are asking this court to repeat. The first is the district court's application of the first prong of the qualified immunity analysis, which is whether the appellees were acting pursuant to their discretionary authority. The second is the artificial line of distinction that the district court drew between the Larry Moore-led Alabama Credit Union Administration and the later Sarah Moore-led same agency. And the third point would be to briefly talk about the district court's construction of the Alabama Credit Union Act, under which the credit union was conserved, because that act does not provide any redress, any procedural protections, or any review for the decision that Mr. Carruth is actually here complaining about, which was the decision to terminate his employment agreement and to deny him his contractual indemnity. With respect to the first issue, the dismissal of all of Mr. Carruth's Let me ask you as a prefatory matter on the first issue whether you preserved it. They say you didn't. Clearly flag it as an issue. Your Honor, we did preserve it. And the reason they say that we didn't preserve it is because in a footnote in our brief, we say that we have incorporated arguments from another section of that brief. The decisions that the appellee cite truly talk about cases where there's no elaboration of a point or a litigant simply says this was wrong. In our particular case, we incorporate our discussion Well, as I read it, the footnote, it's only in a single footnote. It doesn't offer an argument, and it reads in totality in the following way. Quote, Carruth discusses whether the defendants were within the scope of their authority at section 4D herein. Then when you go to 4D, that discusses whether state official immunity applies. Correct, Your Honor. So I'm not clear on how a district court judge was picking this up. He would know that you're actually making the threshold argument here about whether they were acting within their discretionary authority or not at all relevant times. Your Honor, our position, as stated in our briefs, is that the discussion of absolute immunity in the state context, there's overlap between that and the question of whether an official is acting within their discretionary authority. Right. See, but the problem is what you require the court to do then is to dig, look at A, then go to B, and then look at B and note that it talks about state official immunity, and then conclude that maybe state official immunity has an overlap with qualified immunity in the first prong. But our law is pretty clear that you've got to flag an issue. We don't have to hunt for it like looking for red October in the deep Pacific. It should be obvious. It should be clear. We have enough trouble with difficult issues. At least we want to know what the issues are. Your Honor, we believe . . . And my concern is that you really have to do an awful lot of gymnastics to discern that you were making this claim about their discretionary authority. Your Honor, we don't think it's quite as big of a jump, but we also cite authority in our appellate brief that even if we did not sufficiently raise this in the district court, which we believe we did, but given Your Honor's concern, a question of this nature, especially at a motion to dismiss stage on a constitutional claim, it should still . . . So your view is pretty clear it's a matter of law and the mere fact that it wasn't flagged, even if it wasn't fairly flagged, can easily be addressed at this level? That is our position, Your Honor. That's your argument. Okay. Yes. It's a fallback argument, if you will. Let's go right to it. Yes, Your Honor. Were they acting within their discretionary authority or not? The answer to that is no, and we believe that that is as far as the inquiry gets because if they can't meet their burden, our burden never comes up. Even that question of discretionary authority requires a two-part inquiry under this Court's decision in the Holloman case. That two-part inquiry is, number one, whether the State official was engaged in a legitimate job-related function, and number two is whether that legitimate job function was carried out in an authorized manner. We believe the district court . . . The district court, therefore, fell squarely within his authority, his official duties. Your Honor, if that is the only fact we allege, then that alone is not remarkable. But what . . . And that's whether it's remarkable. I asked a different question. It is within the Governor's authority. It's within the Governor's authority to appoint the administrator of the ACU. That is true, Your Honor. But what we allege here is much more, and what the district court did and what the appellees are asking this Court to do, is to take isolated facts, to take not the entire context of the case, but to take isolated facts. And I think it's important to view our complaint and the factual allegations in our complaint as a whole, because they do paint a very disturbing picture, as the district court recognized. And what I mean by that is the district court recognized that with the Larry Morgan-led ACUA administration, we had well-pled factual allegations that that administration was tainted, that there was improper influence from the office of the Governor during the Larry Morgan administration. That is to kind of put the timeline in place here. In 2014 is when we allege that the private attorney in Tuscaloosa, Alabama, filed lawsuits against Alabama One Credit Union. Not being happy with the results he was getting in litigation, he reached out to his former colleague, David Byrne, in the Governor's office, began hundreds of emails that we quote and we cite in the complaint, in-person closed-door meetings, to specifically ask the Governor's office to conserve Alabama and terminate Mr. Carruth. Notably absent from the decision. But isn't the law clear that even if they acted improperly, that doesn't denude their act as being an act that fell within their discretionary duty? We've said that clearly and repeatedly, haven't we? Your Honor, it's not so clear in this context because it is a two-part inquiry. The first question becomes, was it a legitimate job-related function? I guess what I'm saying is, is it not clear as a matter of law in this circuit that we put aside the fact that the actions may have been committed, quote, for an unlawful purpose and ask whether they were still acting within their general discretionary authority as a public official? I don't think it's as clear with respect to the second prong of Holloman. The second prong of Holloman requires the court to determine whether it was carried out in an authorized manner. I think the improper motive, the improper objective, and the improper means of accomplishing that objective are important. And that second question, whether it fell within their legitimate job description? That's the first part of the inquiry. The first part is, is it a legitimate job-related function? And you say it was. We say it wasn't. And the reason we say it wasn't is, it's not a legitimate job-related function, and that's illustrated by the Alabama Supreme Court decision in Riley, which is a, ironically, it's a decision the district court and the appellees rely on. We say it helps us. In Riley, the Alabama Supreme Court said that this supreme executive power of the governor is limited, and the governor can only come in and usurp authority that's been given to another state official when that governor makes an initial determination that the government official is guilty of either inaction or inadequate action. There is nothing in the complaint. This was dismissed on the pleadings. There's nothing in the complaint to support a conclusion that the appellees made that threshold determination. So even under Riley, it points out that the supreme executive power has limits. And so it is not within, it is not a legitimate job-related function for the governor to usurp exclusive power granted to another state official, particularly when they haven't made this initial threshold determination. Let's go on to the next issue, then. Let's assume for the purposes of our discussion that their acts fell within their discretionary authority. The first prong was over. The burden shifts to you. Fire away. Tell me about the rest of the analysis. Yes, Your Honor. There are . . . And let me focus you more precisely and ask, since time is short, have you plausibly alleged that Byrne and Bentley proximately caused the injuries? Yes, we have, Your Honor. Tell me why. I will. And I think the starting point for that discussion is the line of demarcation that the district and the Moore administration. The district court agreed the Morgan administration was tainted and that actions taken by the Morgan administration were improperly influenced by the office of the governor. The mistake that was made is that there was a clear mark, a clear line of demarcation, and the district court said, yes, but you, that being said, you haven't shown that same level of influence and direction as to the Moore administration. What we say is the allegations of the complaint established an uninterrupted continuum of causation and an uninterrupted continuum of a purpose and a plan to carry out an objective. And Your Honor, I'd like to create . . . Other than Byrne telling Moore that Alabama 1 would be a large problem, the allegations look to me to be purely conclusory. What am I missing about that? The allegations . . . You say, for example, that Moore ordered an audit of Alabama 1 pursuant to an in furtherance of the scheme and that Moore observed, conserved Alabama 1 and terminated Caruth while acting at the direction of the defendants. They strike me as very general and conclusory allegations. I'm not sure that they're enough. Your Honor, those allegations have to be viewed in the context of what happened before, which is the Morgan administration. When you view it in that context, when you view the fact that Ms. Moore was a personal friend of David Byrne, which in and of itself is not conclusive, but when you view that along with the fact that she had no regulatory experience, no credit union experience, the governor's office did not follow the usual practice of taking recommendations from the Southeastern League of Credit Unions, which is the industry group that normally submits three names to the governor. The governor selects from those names. Is there a requirement that that occur? There's not a requirement. There's a bare factual allegation. What supports it? I'm sorry. I didn't hear you. What supports this allegation? Well, Your Honor, we would support it with evidence if we got to that point. We have documents. We know this. But I think the thrust of the question is whether you've alleged enough in the complaint beyond making a bold, conclusory allegation, Iqbal and Twombly require you to do more than that. Your Honor, we believe we have. We believe we have. I would like to illustrate this. Suppose the objective here was to break into a building. And we have evidence and allegations of a plan to do so. And we have evidence of plans to get a hammer and break into a building. We're going to hit that spot. We're going to do it at this time. And we're going to do it this way. After a while of banging away with the hammer, they realize the hammer won't do it. So they get a bulldozer. And they knock the wall down in short time and accomplish their objective. The fact that they got a new tool or a new instrumentality does not break that continuum of the objective. And that's exactly what happened here, Your Honor. The hammer, Larry Morgan, wasn't doing the job. So they brought in the bulldozer, Sarah Moore. It does not break the chain of causation. It does not break the plan and the continuum that was going on here that we have laid out in the complaint that we've laid out in our brief. Can you make out a class of one equal protection claim here where the official actions appear to involve subjective and discretionary decision making? Your Honor, we can for two reasons. Number one is we challenged the initial threshold that these were based on. I see my time is up. May I briefly answer your question? We challenged the initial determination that these were based on subjective criteria. What we have here, the benefit of what we have here in the regulatory context is objective financial data. And we will get that in discovery. And we will show that it's objective data that drives whether a credit union is safe and sound. And especially with things like a capitalization rate, perhaps one of the most objective criteria there is and one of the best indicators of the safety and soundness of a credit union. So we would first and foremost challenge whether INQUIST even applies here. But even if it did, INQUIST doesn't say you cannot have a class of one claim under such circumstances. It says you can if the comparators are prima facie identical. Can you use yourself as a comparator to make out an equal protection claim? We believe in the context of a regulated industry. Is there any instance where there's any case where the comparator is yourself at an earlier time, at an earlier incarnation? I couldn't find any. For that factual scenario, no. But it is clearly established that you cannot treat prima facie identical people differently. So we would say it was clearly established for that reason. But the factual scenario. He was treated differently at a different point in time and that's enough. He was treated differently under identical circumstances. And that's enough. Yes, Your Honor. We say that's enough. So he's a comparator of himself. At two different time periods as an officer of a regulated entity. Yes, Your Honor. Final question I have. Have you alleged the substantive or procedural due process claim? Your Honor, we have alleged a procedural due process. What theory are you traveling on? And yes, Your Honor, it was mislabeled in the complaint. Sure was. We would love an opportunity to amend. I'd like to point out we did not. This is our original complaint. Did you request an opportunity to amend? We did not specifically request an opportunity to amend. Unless the panel has any further questions, I see my time is up. Thanks very much. Thank you, Your Honor. Good morning, Judge Marcus. Good morning. May it please the Court. I'd like to start on the second point that Mr. Sloan dwelt on during his argument. There are multiple alternative reasons to affirm here, but this Court can affirm solely on the strength of the inability of the complaint to allege causation as to Bentley and to Byrne. If the Court affirms on that basis, it does not need to reach the qualified immunity question, and it also doesn't need to reach any of the specific issues about whether any of these This Court can affirm the causation conclusion based on the strength of two precedents. One is this Court's decision in Dixon against Burke County. The other precedent is the one Judge Marcus mentioned during the opening argument, the Supreme Court's decision in Iqbal. Let me explain how those two precedents get us to that conclusion. Dixon versus Burke County makes clear that the appointment of Sarah Moore as of April 2015 cuts off the chain of causation between Bentley and Byrne on the one hand and the conservatorship of Alabama I in August 2015. On the other, Burke or Dixon holds that a plaintiff in a Section 1983 case has to establish causation. In other words, the defendants that he is suing actually cause the injury that he is suing for. In most 1983 cases, it's not difficult for a plaintiff to pick a defendant for whom he can prove causation. If you're a plaintiff and you believe your constitutional rights have been violated, then you sue the official who actually did the regulating or who interacted with you directly. So if you believe that you were wrongfully arrested, you sue the police officer who arrested you. If you believe that you were wrongly regulated, you sue the regulators who regulated you. So here, the most obvious defendants for Mr. Kruth to sue would have been Sarah Moore, the ACUA administrator, and the board members of the ACUA. They were the ones who voted on and signed the order that conserved. He has sued Ms. Moore, hasn't he? Yes. So Judge Carnes, exactly. He has sued Ms. Moore in a lawsuit that is pending in this court. It was argued in April. I'm not involved in that case, but that lawsuit is there. And to the extent Mr. Kruth claims that his rights were violated, I'm not saying that the claims he has against Moore are good ones. I suspect that they would fail for the same reasons that we have argued with respect to each individual claim. But at least as to that case, Mr. Kruth doesn't have a— Are the issues overlapping? Are the issues sufficiently overlapping that we should wait before we decide this case? I suspect that the issues do overlap to a certain extent, Judge Marcus. How do they overlap? I believe that there are allegations of takings, for example, perhaps equal protection claims as well. That are the same. I should say, by the way, that that oral argument was sealed and the opinion in the district court in that case was sealed, apparently because of certain privilege issues related to the National Credit Union administration. So I have not been privy to that oral argument. I have not been privy to the summary judgment order in that case. So it's a little unclear to me at this point in time. I was familiar with the complaint because initially Bentley and Byrne were named. No, no, no. Actually, that's a different case. It's a third case that's pending. But I'm— I guess what I'm asking you is a very simple practical question. Should we go ahead and decide this case now or should we wait? I think the court should go ahead and decide the case now. And the reason why is that the causation issue is unique to Bentley and Byrne. And it's a clear reason to— And I interrupted you about Ms. Moore. You had two grounds. And one of your grounds was causation had been broken by the fact that she was the person. They should sue her. You had a second reason you said that you should win on causation. Well, I think what I meant to say was there are two precedents. Oh, okay. I'm sorry. I'm misunderstanding the two. One is Dixon v. Burke County. The other is Ashcroft v. Iqbal. And they interact in a way that requires affirmance here. Dixon v. Burke County requires affirmance because it holds that the chain of causation or it holds that there is no causal relation when the continuum between the defendant's actions and the plaintiff's alleged injury is occupied by the conduct of autonomous and deliberative decision makers. So in this case, we have those autonomous and deliberative decision makers occupying the continuum between Bentley and Byrne's actions as of February, March, April of 2014, and the conservatorship of Alabama I in August 2015. Those decision makers are Sarah Moore, the board of the ACUA, and even the National Credit Union administration is alleged in the complaint to have taken certain actions against Mr. Carruth before the conservatorship was entered. So in the 16-month continuum between the last facts we know about Bentley and Byrne here and the conservatorship, we have the decisions made by all three of those autonomous and deliberative decision makers. Now, Dixon does acknowledge, Dixon does acknowledge that there is a potential workaround for a plaintiff that wants to sue some defendant who wasn't necessarily the direct actor. And that workaround is that if the plaintiff can show that the defendant coerced the decision maker or the defendant acted, had extraordinary influence over the decision maker, at that point in time, perhaps the plaintiff can sue the defendant. But that's where Ashcroft v. Iqbal plays a crucial role in this case. If Mr. Carruth wanted to argue that Bentley and Byrne coerced more the ACUA or the NCUA here, he would have to allege facts, actual facts showing that there was coercion or actual facts showing that there was extraordinary influence as of the time of the August 2015 order entered by the ACUA and signed by Ms. Moore. None of those facts is apparent in the complaint. He alleges no meetings between Bentley, Byrne, and Moore over the conservatorship. He alleges no e-mails. He does not allege that Bentley and Byrne somehow had input on the drafting of the order that was entered by the ACUA. He alleges simply no communications at all between Bentley and Byrne and Moore or the ACUA as to the conservatorship in August 2015. The best that he has been able to do in terms of alleging facts as to Bentley and Byrne is this conversation that he alleges that either Bentley or Byrne had with Moore when she interviewed for the job and said that Alabama I was a big problem that she was going to have to deal with. But that's not coercion. That's not extraordinary influence. That comment is no different from a multitude of other comments that any appointing authority, whether it's the governor or the president, is going to make with a person that they're considering appointing for a job to let that person know here are the things that you may have to deal with. There's no allegation that during that time Bentley or Byrne said to Ms. Moore, you are going to have to conserve Alabama I. There's no allegation that they said anything about what needed to be done. There certainly is no allegation that she would not be hired if she didn't conserve Alabama I. There's no allegation that she would be terminated if she failed to conserve Alabama I. And the fact that no such allegations appear in the complaint, Kruth clearly has some information that has led him to allege the fact that there was a certain statement made during the interview. That suggests that the only statement that Mr. Moore can allege on this front is this relatively innocuous one where Bentley and Byrne, Bentley or Byrne, say that Alabama I is a problem that she is going to have to deal with. So Kruth has had to resort to the same sort of conclusory pleading that Ashcroft v. Iqbal held was insufficient for these purposes and that this court found to be equally insufficient more recently in the McCullough v. Finley case that my client submitted in Rule 28J. Later on, the gist of these conclusory allegations is that the actions of the ACUA in issuing the conservatorship and Moore in leading the ACUA were, quote-unquote, directed by Bentley and Byrne and that Moore was, quote-unquote, acting at their direction. Often those assertions appear as, by all appearances, an afterthought in the complaint in a parenthetical after describing what it is that the ACUA and Moore are alleged to have done. The Supreme Court, Iqbal, this court, and McCullough held that virtually the same allegations were conclusory and not enough to nudge the complaint across the line from possibility to plausibility. The same is true here with respect to the standards that this court had set as a causation in Dixon v. Burke County. Mr. Carruth has also claimed that his complaint provides a mountain of circumstantial evidence from which he says causation can be inferred. The circumstantial evidence he points to is the interactions between Bentley and Byrne and Larry Morgan as to the suspension of Carruth in February and March of 2014, some 14 months, I suppose it is, or maybe 16 months, I'm losing count, before the August 2015 conservatorship. But once again, those allegations don't get Mr. Carruth over the standard that Dixon v. Burke County holds. Dixon v. Burke County says that if the continuum between the defendant's actions and the plaintiff's alleged injury is occupied by a deliberative and autonomous decision-maker, there is no causation. And the relevant, the party that is standing in that continuum for the purposes of the conservatorship is not Larry Morgan as of April 2014. It is Sarah Moore as of August 2015. So facts showing influence, even extraordinary influence over Morgan, cannot show that there was influence or coercion with respect to Moore under this Court's decision in Dixon v. Burke County. One way of thinking about, I think, this causation question before the Court is to consider what would happen if this case were here on summary judgment and the only evidence in the record was the evidence that basically is pleaded by Carruth in terms of facts here. Would a judge allow a case that contained only this evidence to go to the jury or would the judge enter summary judgment? The only evidence is interactions between Bentley and Byrne and Morgan as of March and February 2014 and innocuous statements to Moore when she is appointed. If that's the only evidence in front of the Court at the summary judgment stage, the Court is going to enter summary judgment and not allow that case to go to the jury. But because those are the only actual facts, non-conclusory actual Ashcroft v. Iqbal type facts, that are pleaded in the complaint here, the district court rightly said, the district court said that this required dismissal of a particular account, the retaliation count, but the same logic ought to apply across the board and it's not really a qualified immunity issue. It's a matter of whether the plaintiff has pleaded a cause of action at all. And for that reason alone, this Court can and should affirm, even without waiting on whatever the earlier panel is going to do with respect to the two pending cases involving similar issues at this point in time. Mr. Sloan did address a couple of other issues that I think we don't need to address, but if the Court wants me to, I'm happy to do so. One was the qualified immunity question, and I think it's clear, regardless of whether Carruth adequately raised this issue in his opposition to the motion to dismiss the actions that he pleads with respect to Bentley and Byrne are quite clearly within the scope of their authority under Alabama law and satisfy the two-part test of Holliman. Holliman really is a two-part test that elaborates on the general requirement that the defendant in one of these actions wishing to assert qualified immunity show that the actions alleged of him or her are within their job responsibilities. Bentley and Byrne clearly satisfy that test as to all the facts that are alleged that connect in any way to Sarah Moore here. The only facts that are alleged are the job interview and the fact that Bentley and Byrne were involved in appointing Moore. None of that is outside job responsibilities of the governor and his legal advisor, and I understand Mr. Carruth's counsel to have conceded as much today. The only question is whether Carruth has somehow pleaded his way around qualified immunity through these conclusory allegations that Bentley and Byrne somehow directed the ACUA to take the actions at issue here. Well, there are two responses to that. One is those allegations are conclusory. They aren't sufficient to create a question about whether any such actions would have been outside Bentley and Byrne's job responsibilities, whether they would have been outside their job functions to cite the first prong of Haulman or have exercised their job functions in unauthorized means under the second prong. But the other issue is under the Alabama Supreme Court's decisions, the governor has supreme executive power in everything that relates to the enforcement of Alabama laws within the purview of the Alabama governor. So the Alabama governor becoming involved in the enforcement of laws regulating credit unions would be squarely within his job responsibilities. And thus, if the court addresses the merits issues beyond causation, Bentley and Byrne will be entitled to qualified immunity such that the plaintiff would have to show a violation of not just a constitutional right but a clearly established one. For all the reasons that we have given in the briefs, the plaintiff has not overcome that bar. But more fundamentally, the plaintiff has not established causation through the sorts of factual pleading that Ashcroft v. Iqbal require. It's important that the court uphold the decision on that ground. It's important that officials like the governor and the legal advisor are able to enforce the law without fear of lawsuits that are not based in fact, that fail to connect them in any meaningful way to the governmental action at issue and that fail to raise any clearly established violation of the law. For all those reasons, this court should affirm. Thank you. Thank you very much. Mr. Sloan, you have reserved two minutes. Thank you, Your Honor. May it please the court. Mr. Nyman correctly pointed out that in the Dixon decision, this court said that causation is not broken where there is actual coercion or extraordinary influence and that in such a circumstance, the problem is manifest. We believe for the reasons in our brief and for the reason I argue today, that there is actual coercion and extraordinary influence here. The well-pleaded allegation Alleged actual causation? Excuse me, Your Honor. Did you allege in the complaint? We did, Your Honor. And what we alleged in the continuum of what happened was there was an allegation that Governor Bentley and Mr. Burns sat in a closed door meeting with Larry Morgan and told him to take regulatory action that he knew was not justified or he could resign. Now, we're talking about the next. Correct, Your Honor. And then shortly after that, when that failed, they brought in Sarah Moore. When no regulatory sanctions were pending. Did you allege that they exerted coercion on her or just had this problem with keep your eye on this? This is a serious problem. Your Honor, I believe we alleged actual coercion. I need to check to see if we actually used that phrase. Did you allege facts showing actual coercion? Well, Your Honor, I think one of the issues we're struggling with here is that we had allegations of direct evidence of coercion with respect to Larry Morgan because we had documentary evidence. We haven't had a chance to take evidence. And so with respect to Moore, we have to rely on circumstantial evidence allegations, which is enough. I feel like because we had such detailed allegations with Larry Morgan that those are being contrasted with what we have with Sarah Moore and we're being called to a higher pleading standard with Sarah Moore. The allegations regarding Sarah Moore do provide a circumstantial chain of causation and of coercion. She was brought in as a friend of Mr. Burns. She was specifically told Alabama one is a big problem you need to deal with at a time when there were no regulatory sanctions pending. It was a fraud investigation going on, wasn't there? Alabama one was a was identified as a victim of that fraud. Your Honor, Alabama one was not identified as a perpetrator of that fraud. And so there was a fraud investigation going on. That that was the reason for the part of the reason for the original 2009 problems that Alabama one cleaned up by 2013. Let me ask you a question this way. Do you make any allegation at all that impugns or undermines the independence of the other members of the ACUA board who voted in favor of a conservative? We do, Your Honor. Where in the complaint? I mean, tell me in substance. I've read it and I couldn't find anything that undermined the independence of the other board members. Let alone claim that they were coerced or somehow unduly influenced by the governor or by the lawyer. What we allege is more the cat's paw situation that we briefed, which is that they were provided, all the materials that the board was allowed to review in making their decision were provided by Sarah Moore. They didn't conduct any independent investigation. They simply were looked at the materials she gave them as we allege being a tainted administrator. She gave them towards the end of getting the credit union conserved. They didn't do any independent investigation. They took her recommendation and they gave it the cat's paw. That's our allegation with respect to the ACUA board, Your Honor. Thank you very much. Thank you. Thank you both for your efforts. This court will be in recess until 9 a.m. tomorrow. All rise.